MARION L. ROCKHILL, PLAINTIFF-APPELLANT, v. TOWN-
SHIP OF CHESTERFIELD, IN THE COUNTY OF BUR-
LINGTON, A MUNICIPAL CORPORATION, DEFENDANT-
RESPONDENT.

Argued November 19, 1956—Decided January 14, 1957.

Mr. *John A. Haripence* argued the cause for appellant.

Mr. *Fred G. Stickel, III,* argued the cause for respondent (*Mr. Jay B. Tomlinson,* attorney).

The opinion of the court was delivered by

HEHER, J. The issue here concerns the legal sufficiency of an ordinance of the defendant Township of Chesterfield adopted October 1, 1955, entitled "An ordinance regulating and restricting the location, the size and use of buildings and structures and the use of land in the Township of Chesterfield in the County of Burlington, providing for [its] administration and enforcement * * *, fixing penalties for the violation thereof and establishing a zoning board of adjustment."

The regulation is denominated a "zoning ordinance"; and its "purpose" is declared to be: "* * * lessening congestion in the streets; securing safety from fire, panic and other dangers; promoting health, morals or the general welfare; providing adequate light, air and sanitation, preventing the overcrowding of land or buildings; and avoiding undue concentration of population, * * *," the statutorily-enumerated considerations of policy involved in use zoning. *R. S.* 40:55–32.

But the zoning scheme laid down in the ordinance is not in the conventional pattern; and the inquiry is whether it conforms to the constitutional and statutory principle and policy.

Land and building uses, Article III, shall be "in conformance with the provisions" of the ordinance and the attached "schedule of regulations" entitled "Schedule of Permitted Uses and General Regulations"; and "In addition, certain uses may be permitted and certain modification of requirements may be made in accordance with the special provisions" of the ordinance. "Normal agricultural uses shall be per-

mitted in accordance with the general standards set forth in the schedule," Article IV, including "Accessory uses on the same lot with and customarily incidental to the principal use," in particular, "a roadside stand for sale of farm products conducted solely by the farm operator," and "Migrant housing facilities to be used only on a seasonal basis for migratory farm workers * * * when the buildings are on the farm property and migrant workers perform their labor for occupants of the farm," conditioned as to location in relation to the highway and the observance of statutes and state health regulations pertaining to "migrant housing."

"Residential uses shall be permitted in accordance with the general standards set forth in the schedule," Article V, including certain "Accessory uses on the same lot and customarily incidental to the permitted dwelling unit," provided that (a) "No dwelling unit shall be located within 250 feet of, or between buildings of an existing or permitted light industrial activity"; (b) where a dwelling unit is located on a corner lot, there shall be a side yard as therein prescribed; and (c) there shall be "off-street parking for all residences," as set down in the schedule.

Provision is then made, Article VI, for "Special Uses"; and this is the declared "Purpose": "In view of the rural characteristics of the Township, it is deemed desirable to permit certain structures and uses but only after investigation has shown that such structures and uses will be beneficial to the general development"; and "In order to assure that such structures and uses meet all requirements and standards, all applications for zoning permits shall be referred to the Planning Board for review in accordance with Revised Statutes 40:55–1.13." The planning board is directed to "investigate the matter in accordance with the standards herein provided and submit its recommendations in writing to the Governing Body within 45 days after the filing of the application with the Zoning Officer." But the board shall, before the recommendation is made, conduct a public hearing in accordance with the procedure provided by *R. S.*

40:55–1.7, on the notice "required for subdivision plat approval." And the governing body "shall, no later than the second regularly scheduled meeting after the receipt" of the board's report, "either approve or disapprove the application by resolution based on the standards as set forth" in the ordinance; and "if approved, the necessary zoning permit shall then be issued."

These are the stated "special structures and uses which may be permitted only in keeping with the special standards herein listed," Article VI: (a) an "existing one-family dwelling may be converted into multi-family dwelling units," subject to certain conditions and specifications and the submission of the plans to the planning board "prior to approval or disapproval"; (b) "Neighborhood business" may be permitted subject to prescribed physical conditions, including these particular uses: groceries and foodstuffs; package liquors; drugs and pharmaceuticals; confectionery; dry goods and notions; feed and grain; stationery; hardware and paints; radio and television services; books and tobacco; periodicals and newspapers; antiques; barber and beauty shops; tailoring and dressmaking; dry cleaning and laundry collection but not processing facilities; shoe repairing; banks and professional offices; and service or repair establishments not employing more than three persons, all "neighborhood business" to provide "off-street loading and unloading facilities * * * located on the same lot" but not "in the required front yard area," and to conform to regulations as to signs indicating the business use; (c) "Designed shopping center units may be permitted" subject to specified conditions, and "Any business use that is not specifically prohibited within the Township and not included in Section 3, paragraph b, or Article VI may be considered to be a permitted business use if the Planning Board deems such business use to be desirable and to the best interests of the Township," provided that "An area at least five feet in width and following the lot lines of the business property if adjacent to residential properties shall be properly landscaped to form a buffer screen between residential and

business uses," and the required illumination during evening business periods "shall be shielded from adjacent residential properties and public roads or streets"; (d) "Gasoline and Filling stations may be permitted" if certain requirements are met, provided that the "use shall be located on a lot whose lot lines are located not less than 300 feet from any existing dwelling and not less than 1,000 feet from any public school or church," and at least 25 feet from the street line and rear and side property lines, and "any gasoline station shall not be located at the corner of any dangerous street or road intersection which is so termed by the Township Committee"; (e) "Restaurants and roadside refreshment uses may be permitted," at the same distances from other land uses prescribed in (d) *supra,* and provided, *inter alia,* that parking space "shall be available to adequately meet maximum capacity conditions," and parking areas shall be illuminated during evening business operations and "shielded from adjacent residential properties and public roads or streets"; (f) "Light industrial uses and other similar facilities having no adverse effect on surrounding property and deemed desirable to the general economic well-being of the Township may be permitted," and "Included among such uses may be administrative offices, laboratories, research offices and light manufacturing or processing," provided that the "industrial activity shall not by its own inherent characteristics or industrial processes be noxious or injurious to the adjacent properties by reason of the production or emission of dust, smoke, refuse matter, odor, gas, fumes, noise, vibration, unsightly conditions, or other similar conditions," also that certain sanitation requirements shall be met, and that no "building or structure" shall be located within 1,000 feet of an "existing or proposed school or public facility" or 250 feet from the "adjoining lot line of any existing dwelling unit" or 200 feet from the "adjoining lot line of any business use"; and (g) "Public utility uses such as distribution lines, towers, substations and telephone exchanges but no service or storage yards may be permitted," provided the planning board finds that the "design of any

structure in connection with facility conforms to the general character of the surrounding area and will in no way adversely affect the safe and comfortable enjoyment of property rights of the Township," and there is provision for "adequate and attractive fences and other safety devices" and "sufficient landscaping * * * periodically maintained."

"Non-conforming uses" are continued, Article VII; and there are "general regulations," Article VIII, pertaining to "open space" and "visibility at intersections" which need not be set out here.

Certain uses are prohibited altogether, Article IX - - - these among others: "Commercial or periodic auction sales"; "Used car lots or used car sales"; "Tourist cabins, motels and trailer camps"; "Manufacture or sale of pottery and cast stone decorations"; "Drive-in theatres"; "Slaughter houses and abbatoirs"; "Junk yards and scrap reclamation"; "Garbage-fed piggeries"; "Billboards and advertising of products not for sale on the premises"; "Salvage and wrecking activities"; and "Multi-family dwelling units, other than permitted conversions; and similar types of uses of land, structures and buildings so adjudged by the Zoning Board of Adjustment."

Provision is made for the "enforcement" of the ordinance by a "zoning officer" to be appointed by the governing body, and for zoning permits and certificates of occupancy where the terms of the ordinance have been met.

A "zoning board of adjustment" is established, purportedly under R. S. 40:55–36, to exercise the functions provided for in R. S. 40:55–39, as amended, and in particular the "right to vary the strict application of any of the requirements" of the ordinance "in the case of exceptionally irregular, narrow, shallow or steep lots, or other exceptional physical conditions, whereby such strict application would result in practical difficulty or unnecessary hardship that would deprive the owner of the reasonable use of the land or building involved, but in no other case," the grant of the variance to be subject to "any conditions" that the board "deems to be necessary or desirable."

But no variance "in the strict application" of the ordinance shall be granted unless the board finds (a) that in the "special circumstances or conditions fully described in the findings, applying to" the particular land or building, the "strict application" of the ordinance would "deprive" the landowner "of the reasonable use" of the land or building; (b) for "reasons fully set forth in the findings, the granting of the variance is necessary for the reasonable use of land or building," and the variance "as granted by the Board is the minimum variance that will accomplish this purpose"; and (c) the "granting of the variance" will be "in harmony with the general purpose and intent" of the ordinance and "will not be injurious to the Township or otherwise detrimental to the public welfare": and here the board is enjoined, "[i]n addition to considering the character and use of adjoining buildings and those in the vicinity," to "take into account the number of persons residing in such buildings or upon such land and traffic conditions in the vicinity."

The board is directed to follow the procedure prescribed by *R. S.* 40:55–42 "and by this ordinance," and to make its "decisions" by resolution embodying a "full record of the findings of the Board * * *."

The Law Division of the Superior Court set aside Article VI, section 3(c) iv, of the ordinance providing that "any business use * * * not specifically prohibited" within the township, and not included in section 3, paragraph b of that Article, "may be considered to be a permitted business use," if the planning board deems such use "to be desirable and to the best interest of the township," as a regulation wanting in "proper constitutional standards to guide the administrative action" of the board and the township committee; but sustained the ordinance otherwise; and we certified here plaintiff's appeal from so much of the judgment as affirms the ordinance in part. There was no cross-appeal.

Zoning is in its essential policy and purpose a component of the reserve element of sovereignty denominated the "police power," the sovereign right so to order the affairs

of the people as to serve the common social and economic needs, the principle that brought them together in civilized society for their mutual advantage and welfare, to which all property is subject; but whatever its quality and scope as an attribute of sovereignty, land use regulation in New Jersey is now controlled by *Article IV, Section VI, paragraph 2* of the 1947 *State Constitution,* embodying and amplifying the amendment of the 1844 *Constitution, Article IV, Section VI, paragraph 5,* adopted at a special election held September 20, 1927, whereby the Legislature is empowered to enact "general laws" under which municipalities, other than counties, may adopt "zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land," an exercise of authority "deemed to be within the police power of the State." However broad the police power inherent in sovereignty to invoke measures conducive to the general good and welfare, the exercise of the zoning process must perforce conform to the constitutional regulation and the enabling statute. *Schmidt v. Board of Adjustment of City of Newark,* 9 N. J. 405 (1952).

The constitutional and statutory zoning principle is territorial division according to the character of the lands and structures and their peculiar suitability for particular uses, and uniformity of use within the division. And the legislative grant of authority has the selfsame delineation. *R. S.* 40:55–30, as amended by *L.* 1948, *c.* 305, *p.* 1221.

██ The local governing body is empowered, *R. S.* 40:55–31, as amended by *L.* 1948, *c.* 305, to divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the statutory policy, and to regulate and restrict the construction and use of buildings and other structures and the use of land within such districts, provided that "All such regulations shall be uniform for each class or kind of buildings or other structures or uses of land throughout each district, but the regulations in one district may be different from those in other districts." And

such regulations shall be, *R. S.* 40 :55–32, in accordance with a "comprehensive plan and designed" to subserve the public welfare in one or more of the enumerated particulars involving the public health, safety, morals, or the general welfare, and "shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality." And thus it is basic to the local exercise of the power that the use restrictions be general and uniform in the particular district, delimited in keeping with the constitutional and statutory considerations; otherwise, there would be the arbitrary discrimination at war with the substance of due process and the equal protection of the laws.

██ Classification to this end must be reasonably based in the public interest to be served. It is fundamental in our zoning policy that all property in like circumstances be treated alike. There cannot be invidious distinctions. And so it is that the use-district restraints are required to be general and uniform. All this, in virtue of the legislative grant itself, quite apart from constitutional zoning concept and the precepts for the fulfillment of basic civil liberties. *Raskin v. Town of Morristown*, 21 *N. J.* 180 (1956) ; *Beirn v. Morris*, 14 *N. J.* 529 (1954). Constitutional uniformity and equality demands that classification be founded in real and not feigned differences related to the purposes for which the classes are formed, *i. e.*, zoning by districts according to the "nature and extent" of the use of land and buildings, to serve the statutory police considerations, some or all, the regulations to have reasonable regard to the "character of the district and its peculiar suitability for particular uses." *Katobimar Realty Company v. Webster*, 20 *N. J.* 114 (1955). "Spot zoning" would contravene the constitutional and statutory principle of zoning by districts in consonance with the character of the lands and structures and use suitability, and uniformity of use within the division. *Moriarty v. Pozner*, 21 *N. J.* 199 (1956). Such is the case here.

The scheme of the ordinance is the negation of zoning. It overrides the basic concept of use zoning by districts, that is to say, territorial division according to the character of the lands and structures and their peculiar use suitability and a comprehensive regulatory plan to advance the general good within the prescribed range of the police power. The local design is "normal agricultural" and residence uses and the specified "special uses" by the authority of the planning board and the local governing body, generally where "investigation has shown that such structures and uses will be beneficial to the general development," and "light industrial uses and other similar facilities having no adverse effect on ˎsurrounding property and deemed desirable to the general economic well-being of the Township," terms hardly adequate to channel local administrative discretion but, at all events, making for the "piecemeal" and "spot" zoning alien to the constitutional and statutory principle of land use zoning by districts and comprehensive planning for the fulfillment of the declared policy. The fault is elementary and vital; the rule of the ordinance is *ultra vires* and void. See *Raskin v. Town of Morristown, supra.*

█ Reserving the use of the whole of the municipal area for "normal agricultural" and residence uses, and then providing for all manner of "special uses," "neighborhood" and other businesses, even "light industrial" uses and "other similar facilities," placed according to local discretion without regard to districts, ruled by vague and illusive criteria, is indeed the antithesis of zoning. It makes for arbitrary and discriminatory interference with the basic right of private property, in no real sense concerned with the essential common welfare. The statute, *N. J. S. A.* 40:55–39, provides for regulation by districts and for exceptions and variances from the prescribed land uses under given conditions. The course taken here would flout this essential concept of district zoning according to a comprehensive plan designed to fulfill the declared statutory policy. Comprehensive zoning means an orderly and coordinate system of community development according to socio-economic needs. See Professor Haar's

exposition of the relation between planning principles and the exercise of the zoning power, *"In Accordance With a Comprehensive Plan,"* 68 *Harv. L. Rev.* 1154, and the comment, *p.* 1170, that the phrase "in accordance with a comprehensive plan" apparently had its origin in section 3 of the Standard State Zoning Enabling Act, accompanied by this explanatory note: "This will prevent haphazard or piecemeal zoning."

*Duffcon Concrete Products, Inc., v. Borough of Cresskill,* 1 *N. J.* 509 (1949), is not to the contrary. There, the zoning ordinance excluded all industry from the municipality, a small residential community in Bergen County, in area 1,300 acres and in population 2,300. In an endeavor to maintain its residential character, the borough in 1941 adopted an ordinance establishing four zones, three entirely residential, and the fourth for "commercial districts for business centers." Chief Justice Vanderbilt said that what may be the most appropriate use of any particular property depends not alone on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also "on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously," and the "effective development of a region should not and cannot be made to depend upon the adventitious location of municipal boundaries, often prescribed decades or even centuries ago, and based in many instances on considerations of geography, of commerce, or of politics that are no longer significant with respect to zoning," that is to say, the "direction of growth of residential areas" and of "industrial concentration" refuses to be "governed by such artificial lines"; that changes in "methods of transportation" and "in living conditions" have accentuated the "unreality" of dealing with zoning problems on the basis of the territorial limits of a municipality, and "[i]mproved highways" and "new transportation facilities" have made possible the "concentration of industry at places best suited to its development to a degree not contemplated in the earlier

stages of zoning"; and that the advantages of the "existing and currently developing suburban and rural sections given over solely to residential purposes and local retail business services coextensive with the needs of the community" inure alike to "industry and residential properties and, at the same time, advance the general welfare of the entire region." Attention was directed to the "availability and use of the extensive bottom lands of the Hackensack River Valley within the region for industrial purposes," as indicating that the zoning scheme "comprehends, in the language of the statute, 'the most appropriate use of land throughout such municipality,' *R. S.* 40:55-32." This rationale conforms to the basic principle of zoning by districts, and comprehensive regulation according to the given statutory considerations.

 Zoning and planning are not identical in concept. *Mansfield & Swett, Inc., v. Town of West Orange,* 120 *N. J. L.* 145 *(Sup. Ct.* 1938). Zoning is a separation of the municipality into districts for the most appropriate use of the land, by general rules according to a comprehensive plan for the common good in matters within the domain of the police power. And, though the landowner does not have a vested right to a particular zone classification, one of the essential purposes of zoning regulation is the stabilization of property uses. Investments are made in lands and structures on the faith of district use control having some degree of permanency, a well considered plan that will stand until changing conditions dictate otherwise. Such is the nature of use zoning by districts according to a comprehensive plan. *Kane v. Board of Appeals of City of Medford,* 273 *Mass.* 97, 173 *N. E.* 1 *(Sup. Jud. Ct.* 1930); *Strain v. Mims,* 123 *Conn.* 275, 193 *A.* 754 *(Sup. Ct. Err.* 1937); *Stone v. Cray,* 89 *N. H.* 483, 200 *A.* 517 *(Sup. Ct.* 1938). The regulations here are in contravention of the principle.

The ordinance is vacated as *ultra vires* the enabling statute; and the cause is remanded for judicial action accordingly.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6

*For affirmance*—None.